[No. 7343–5–I.  Division One.  April 21, 1980.]

PATRICIA A. FARMAN, *Appellant,* v. PAMELA S. FARMAN, *Respondent.*

*Robert C. Dickerson II, William R. Hickman, Ron J. Perey,* and *Reed, McClure, Moceri & Thonn,* for appellant.

*Grant L. Anderson* and *Tuell, Anderson & Hudson,* for respondent.

Swanson, J.—Plaintiff Patricia Farman brought this action against her former husband, John Farman, and his second wife, Pamela S. Farman, individually and as a marital community, seeking damages for allegedly outrageous conduct and intentional and negligent infliction of mental distress. Plaintiff claimed that defendant Pamela Farman made over 1,000 harassing telephone calls to her. By jury verdict against Pamela Farman, plaintiff was awarded $15,000. She appeals from the order dismissing the complaint against John Farman and the marital community. Pamela Farman cross–appeals from the award of damages, arguing that no evidence of extreme emotional distress was presented.

In April of 1976, after 9 years of marriage, Patricia and John Farman separated. That summer John began to date Pamela Hendrickson whom he had met the previous year and who was also recently separated from her spouse. In the late summer or fall of 1976 Patricia Farman began receiving anonymous telephone calls. All the calls were the same—when Patricia answered there was no reply, only the sound of normal breathing—and were apparently made by someone who was familiar with Patricia's schedule. In November of that year Patricia contacted the Enumclaw Police Department and the telephone company, hoping to stop the calls. The calls, however, continued, and Patricia allegedly suffered from nervousness and weight loss as a result. She began taking tranquilizers and sleeping pills which had been prescribed by two physicians. She also kept a gun for protection.

John and Patricia were divorced in January of 1977, and the next month John married Pamela Hendrickson. The telephone calls continued. After further complaints to the telephone company, Patricia was given an unlisted number, and for a time the calls ceased. Patricia was protective of her unlisted number. She never wrote it down, and she instructed each person to whom she gave it to give it to no one else.

In April of 1977 Patricia Farman gave the unlisted number to John, and he subsequently gave the number to his wife Pamela. John gave the number to no one else. On April 11 Patricia received a birthday card with a message written in a scrawled, bizarre hand. The message said, in part, "[Y]ou changed your number. That really hurt me. I have ways and I'll get it soon, so you'll be hearing me. Until then I'll be watching you at the bank. Hope to be hearing your voice soon."

About 2 weeks later the calls resumed and continued through the summer and into the fall of 1977. In July or August, Patricia's boyfriend's mother, Ruth Hendrickson,[1] began receiving similar calls at her place of business, the Kitchen Restaurant. Pamela Farman had previously worked for Ruth Hendrickson at the Kitchen Restaurant before being fired. Ruth Hendrickson complained to the telephone company, and as a result a "trap" was put on the restaurant phone. The calls to the restaurant ceased, and at Ruth's request the trap was transferred to Patricia's telephone. At about 11 p.m. on the night the trap was installed a call was trapped. That call came from the home of John and Pamela Farman.

Pamela subsequently admitted making two of the calls when she entered a plea of guilty to a criminal charge. At trial she admitted to making some 35 to 40 of the calls and also admitted that she sent the "birthday card," but she denied making the 1,000 calls Patricia allegedly received.

At the close of plaintiff's case, defendants John Farman and the marital community moved for dismissal based upon insufficiency of the evidence, and the motion was granted. Pamela Farman then rested without presenting evidence, and the jury verdict of $15,000 was returned against her.

Our Supreme Court, from an early date, has held that the spouse who does not commit the tort cannot be held personally liable. *See Sandgren v. West,* 9 Wn.2d 494, 115 P.2d 724 (1941), and cases cited.

---

[1] Ruth Hendrickson is no relation to Pamela Farman, *nee* Hendrickson.

The legislature expressed the same view when, in 1972, it amended the statutes governing community property. Formerly, the husband's property was insulated from liability for injuries committed by his wife. RCW 26.16.190 now provides,

> For all injuries committed by a married person, there shall be no recovery against the separate property of the other spouse *except in cases where there would be joint responsibility if the marriage did not exist.*

(Italics ours.) *See* Cross, *The Community Property Law in Washington,* 49 Wash. L. Rev. 729, 834 (1974).

Despite the absence in plaintiff's complaint of an allegation of negligence on the part of John Farman individually, plaintiff argues on appeal that John knew or should have known that his new wife was making the telephone calls. Moreover, in argument to the trial court in opposition to defendant's motion to dismiss, counsel for plaintiff stated that the circumstances of the case imposed upon John a duty to inquire further into whether his wife was making the calls.

We thus assume, although her argument is somewhat unclear, that plaintiff alleges negligence on the part of John Farman individually and that she should be allowed to reach his separate property because this is a case within the meaning of RCW 26.16.190 in which joint responsibility would attach if the marriage of John and Pamela Farman did not exist.

■ Although we recognize plaintiff's argument, we are not persuaded by it. It is true that defendant's motion to dismiss admits the truth of plaintiff's evidence and all reasonable inferences that may be drawn therefrom. *Moyer v. Clark,* 75 Wn.2d 800, 454 P.2d 374 (1969). This case, however, lacks the elements necessary to find that John and Pamela were joint tort–feasors. Those necessary elements are: "(1) a concert of action, (2) a unity of purpose or design, (3) two or more defendants working separately but to a common purpose and each acting with the knowledge and consent of the others." *Rauscher v. Halstead,* 16 Wn.

App. 599, 601, 557 P.2d 1324 (1976). The record here contains no evidence that John knew Pamela was the caller.

Plaintiff, however, argues that John *should have known* that Pamela was making the calls or that he had a duty to make some inquiry regarding the calls. Thus, plaintiff appears to suggest that John's failure to discover the caller's identity is, by itself, enough to make him liable for the injuries to plaintiff resulting from Pamela's intentional tort. However, plaintiff cites no authority and makes no argument to support this apparent contention. We will not construct an argument on plaintiff's behalf when she has failed to do so herself. *In re Marriage of Croley*, 91 Wn.2d 288, 588 P.2d 738 (1978).

The question of community liability raises different issues. Plaintiff offers a number of theories upon which community liability can be predicated, including management of community property and that Pamela was acting to benefit the marital community.[2]

Community liability is established if the tortious act of a spouse was committed for the benefit of the community or in the course of management of community property. *Brown v. Spokane County Fire Protection Dist. 1*, 21 Wn. App. 886, 586 P.2d 1207 (1978); *Benson v. Bush*, 3 Wn. App. 777, 477 P.2d 929 (1970). We agree with defendants that the harassing telephone calls in this case were not made to benefit the community. The only testimony at trial regarding why Pamela made the calls was that she did not like plaintiff and wanted to "bother her." The plaintiff would have us take this fact and draw from it the inference that Pamela Farman, jealous of plaintiff, made the calls to protect the very existence of her new marriage. There is,

---

[2]Plaintiff also argues on appeal that community liability may attach under a theory of "recreational activity" because Pamela stated at a deposition that she made two of the calls as a "prank." However, *contrary to plaintiff's assertion*, "recreational activity" does not designate a separate "line of cases" but is a phrase found in cases involving the family car doctrine. *See Edmonds v. Ashe*, 13 Wn. App. 690, 693 n.1, 537 P.2d 812 (1975). The recreational activity analysis is inapposite here.

however, no evidence whatever to support such a conclusion, and it does not follow logically from the fact that Pamela wanted to "bother" plaintiff because she disliked her.

█ Even assuming arguendo that Pamela was hoping some benefit to the community would result from the telephone calls, community liability cannot attach under the theory of community benefit when, from the perspective of a reasonable person, the wrongful acts in question are unlikely to produce the desired community result. *Edmonds v. Ashe,* 13 Wn. App. 690, 537 P.2d 812 (1975). A reasonable person could not believe that the anonymous telephone calls involved in this case would have the result of strengthening or prolonging the marriage of John and Pamela Farman. The opposite effect might just as likely result.

On the issue of management of community property, plaintiff calls our attention to our decision in *Benson v. Bush, supra,* where community liability was established under a management theory even though the marital community received no benefit from the tortious act in question. In that case, the plaintiff's dog ran onto defendant's front porch and attacked defendant's dog. The defendant broke up the fight with a chemical spray, then turned the spray on the plaintiff, causing injury. We observed that as manager of the community property the husband must exercise judgment, and the community is bound by his actions whether they are good, bad, or even criminal. Plaintiff argues that the amendment to the community property statute giving both spouses equal management rights operates to make the community equally liable for the acts of the wife. Further, the plaintiff argues, the community telephone involved here is a more significant "community tie" than the community dog in *Benson.*

We agree that the 1972 amendment to this state's community property statues makes the community liable for the torts of the wife to the same extent the community was liable under previous law for the husband's torts. However,

the element of management of community property present in *Benson* is lacking in this case. In *Benson*, the dispute began on community real property in addition to involving the couple's dog. The assault itself took place on the porch. We thus concluded that the community character of the husband's actions had not been broken off, and he had not launched upon an individual enterprise of his own.

A case similar to *Benson* and cited therein is *McHenry v. Short*, 29 Wn.2d 263, 186 P.2d 900 (1947), an action for wrongful death in which the decedent died as a result of a beating administered by the defendant husband. There had been previous animosity between the men, but the altercation arose out of the decedent's presence on property that the husband had been employed to protect as a watchman or in which the marital community claimed an ownership interest. Thus, the court said, in assaulting the decedent, the husband had not wholly shed his character as agent of the community.

In this case, on the other hand, Pamela's campaign of harassment against the plaintiff began prior to her marriage to John Farman. She never acted as an agent for, or on behalf of, the community, even after the marriage took place. As noted, her actions in no way benefited the community. Moreover, the community property involved—the telephone—did not itself precipitate an altercation between plaintiff and Pamela in the same way community real property and a community pet did in *Benson* and *McHenry*. The simple fact that Pamela used the community telephone to place some of the calls is insufficient, standing alone, to make her action anything more than "a misdeed for which [s]he alone [is] chargeable." *McHenry v. Short, supra* at 274.[3]

---

[3]Also distinguishable is *LaFramboise v. Schmidt*, 42 Wn.2d 198, 254 P.2d 485 (1953), cited by plaintiff, in which the community was held liable for the husband's taking indecent liberties with a foster child. The family had been paid to care for the child; hence, the husband's tort was committed in connection with an activity by which community funds were earned.

■ Pamela Farman's cross appeal, in which she argues there was an absence of substantial evidence to support an award of damages for severe emotional distress, is easily disposed of. The amount of damages to be awarded is a question for the trier of fact. As comment *k* to Restatement (Second) of Torts § 46 (1965) indicates, "Normally, severe emotional distress is accompanied or followed by shock, illness, or other bodily harm, which in itself affords evidence that the distress is genuine and severe."

In this case, plaintiff and several of her witnesses testified regarding her appearance of nervousness and considerable weight loss. There was also testimony that she became withdrawn and fearful of going home at night, that she was unable to perform certain duties at her job, and that she took tranquilizers. Witnesses also testified uniformly that she returned to normal after she learned the identity of the caller, and the calls ceased. There was thus substantial evidence from which the jury could conclude that plaintiff suffered extreme emotional disturbance.

Given our disposition of the case, we need not consider the issues raised in plaintiff's so-called "protective appeal."

The order dismissing the complaint against John Farman and the marital community and the judgment awarding damages are affirmed.

ANDERSEN and DURHAM–DIVELBISS, JJ., concur.

Reconsideration denied June 19, 1980.

Review by Supreme Court pending January 30, 1981.